## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____
                              )
BLYDEN A. DAVIS,              )
                              )
            Plaintiff,        )
                              )
      v.                      )   Civ. Action No. 08-290 (EGS)
                              )
JOSEPH J. MAGNOLIA, INC.,     )
                              )
            Defendant.        )
_____)
```

## MEMORANDUM OPINION

Plaintiff Blyden A. Davis, an African-American male, has filed discrimination and retaliation claims against defendant Joseph J. Magnolia, Inc., his former employer, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.* Pending before the Court is defendant's motion for summary judgment on all claims. Upon consideration of the motion, the response and reply thereto, the applicable law, and the entire record, and for the reasons stated herein, the Court hereby **GRANTS IN PART AND DENIES IN PART** defendant's motion for summary judgment.

## I.  BACKGROUND

Plaintiff was hired by defendant in April 2005 as a heavy equipment operator working at construction job sites.  Soon after being hired, plaintiff received two or three oral warnings

in May 2005 concerning his inability to operate heavy equipment,
followed by a written warning issued on June 2, 2005. The
written warning, issued by plaintiff's supervisor at the time,
Fred Wedding, stated that plaintiff "was hired as a heavy
equipment operator with 10 years of previous experience.
However, over the course of a month, Mr. Davis has proven to be
uncapable [*sic*] of operating heavy machinery at this site."
Def.'s Ex. 8. Plaintiff signed the warning and indicated he
"agree[d] with the employer's statement." Def.'s Ex. 8.
Another written warning dated June 8, 2005 issued by John Kulp,
the Director of Site Utilities, similarly stated that plaintiff
"is unable to perform the task of operating equipment as needed"
and that plaintiff would be transferred to a different crew at a
reduced rate of pay. Def.'s Ex. 9. The June 8 warning also
stated that "if [plaintiff's] actions do not i[m]prove, with new
crew we may let him go." Def.'s Ex. 9.

Plaintiff was assigned to a new crew, this one supervised
by Foreman Jeff Forsythe. Plaintiff alleges that while working
on this crew, in July 2005, a fellow employee informed him that
Forsythe had referred to plaintiff as a "nigger." Compl. ¶ 13;
Def.'s Ex. 10. Plaintiff made an internal complaint regarding
Forsythe's allegedly discriminatory conduct on October 17, 2005.
Def's Ex. 10. Defendant conducted an investigation and

interviewed plaintiff, Forsythe, and other members of the crew. Following the investigation, Forsythe received a written warning on November 19, 2005. Def.'s Ex. 12. The warning indicates a "violation of company policy/procedures" and "unsatisfactory behavior towards employees or customers." Def.'s Ex. 12.

On November 2, 2005, while still working on Forsythe's crew, plaintiff received another written warning. This warning stated that plaintiff had been insubordinate and violated company policies by failing to take a required training class. Specifically, the warning stated that plaintiff "did not want to attend traffic flagging safety class. Jeff Forsythe had to ask[] several times before [plaintiff] attended training class. [Plaintiff] would not take the written test after the class was completed. Mark Tavenner [defendant's Safety Director] was teaching the class & has documented this issue. This is final warning before discharge." Def.'s Ex. 14. Plaintiff concedes that he received this warning, but he asserts that the warning was undeserved because – although he did not take the written test in November 2005 – he did attend the class itself. Plaintiff also argues that the November 2005 warning was undeserved because he had taken the traffic flagging safety course on another occasion. In December 2005, after plaintiff had made the internal complaint regarding Forsythe and after the

incident related to the flagging course, plaintiff was

transferred to a third crew, supervised by Foreman George

Shegogue.

On January 6, 2006, plaintiff filed a complaint with the

District of Columbia Office of Human Rights ("DCOHR"), alleging

discrimination on the basis of race, as well as retaliation.

Def.'s Ex. 15.

Two more incidents occurred before plaintiff was

terminated.  On January 30, 2006, plaintiff received a written

warning for failing to report an accident which caused damage to

equipment.  Def.'s Ex. 17.[1]  Subsequently on April 25, 2006,

plaintiff was involved in an altercation at a job site.  Though

the parties disagree on the particulars, it is undisputed that

plaintiff was involved in some kind of disagreement at a job

site with one of defendant's customers, the general contractor

at the job site.  According to plaintiff, after an employee of

the general contractor repeatedly did not move a truck out of

plaintiff's way, plaintiff became "agitated" or "upset" and

asked the general contractor's employee to move the truck before

---

[1]     At the time the warning was issued, plaintiff again signed
the warning and indicated that he agreed with the employer's
statement.  Def.'s Ex. 17.  Plaintiff now asserts, however, that
the warning was undeserved because defendant's policies only
require that accidents must be reported, not that all employees
involved report each accident.  Because another employee
reported the incident, plaintiff asserts that there was no
violation of company policy.  Pl.'s Mem. 36-37.

plaintiff "hit it" with the vehicle plaintiff was operating.

Def.'s Ex. 21; Def.'s Ex. 24. In an email plaintiff sent on

April 28, 2006, plaintiff explained the incident as follows:

> I had asked one of the supers to have his friend move
> his truck out of our way 5 times. . . . [E]ach time I
> asked I did become more agitated. The last time I
> said "Come on move the truck before I slam the machine
> into it" (accidentally of course). Well I was kinda
> pissed off so I stopped my machine and asked them
> where my cat key was which I had let them borrow the
> previous day 4/26/06. they told me it was on the
> machine so I retrieved it and went about my business.

Def.'s Ex. 24. Defendant, relying on the testimony of another

witness, asserts that plaintiff also yelled into the trailer

belonging to the superintendent: "Are you going to move this

shit or what." Def.'s Mem. 7.

It is also undisputed that after the incident at the job

site, plaintiff's supervisor George Shegogue told plaintiff to

report to the office the next day for a meeting with Kulp. At

that meeting, Kulp informed plaintiff that the general

contractor had demanded that plaintiff be permanently removed

from its job site. The parties further agree that defendant

then conducted an investigation of the general contractor's

allegations, at which time plaintiff provided defendant with a

written statement. Def.'s Ex. 21. At the conclusion of the

investigation, and despite an otherwise favorable performance

review from Shegogue, defendant terminated plaintiff on May 3,

2006.  The termination report listed several reasons for the

termination, including: 1) "insubordinately refused to take

safety course," 2) "dishonest[l]y failing to report @ fault

accident w/ property damage," 3) "morale and conduct

unbecoming," 4) "solicitation of employment to another

contractor," and 5) "performance was bad enough that super had

to remove him before [he] could cause physical altercation

amongst contractors."  Def.'s Ex. 25.

After he was terminated, plaintiff amended his complaint

with DCOHR to reflect his termination, asserting that the

termination was motivated by unlawful retaliation.  Def.'s Ex.

26.  In a Letter of Determination dated November 28, 2006, DCOHR

found no probable cause to believe defendant subjected plaintiff

to discriminatory conduct or retaliated against plaintiff.

Def.'s Mem. Ex 27.  The EEOC issued a Dismissal and Notice of

Rights on November 19, 2007 stating that the EEOC "adopted the

findings of the state or local fair employment practices agency

that investigated this charge."  Def.'s Ex. 28.  On February 20,

2008, plaintiff initiated this lawsuit.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that

there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  Though the Court must draw all justifiable inferences

in favor of the non-moving party in deciding whether there is a

disputed issue of material fact, "[t]he mere existence of a

scintilla of evidence in support of the [non-movant]'s position

will be insufficient; there must be evidence on which the jury

could reasonably find for the [non-movant]." *Anderson*, 477 U.S.

at 252.  "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted." *Id*.

at 249-50 (internal citations omitted).

## III. ANALYSIS

### A.    Statute of Limitations: D.C. Code § 2-1403.16(a)

Plaintiff's DCHRA claims are time barred.  D.C. Code

§ 2-1403.16(a) provides that "[a] private cause of action

pursuant to this chapter shall be filed in a court of competent

jurisdiction within one year of the unlawful discriminatory

act[.]"  *Id.*  Plaintiff argues that the statute of limitations

was tolled because he filed an administrative complaint, but

§ 2-1403.16(a) provides only that "[t]he timely filing of a

complaint with the [District of Columbia Office of Human Rights]

. . . shall toll the running of the statute of limitations *while

the complaint is pending*."  *Id.* (emphasis added).

Plaintiff filed his administrative complaint in January 2006, and on November 28, 2006 the DCOHR issued a Letter of Determination finding "no probable cause" to believe that plaintiff was subjected to a hostile work environment or retaliation. The Letter of Determination explicitly informed plaintiff that the OHR had "completed the investigation of [his] complaint." Def. Ex. 27 at 1. The Letter of Determination further stated that plaintiff could apply to the Director of the OHR for reconsideration within 30 days and explained that if plaintiff "does not file a request for reconsideration with the OHR, this letter constitutes a final decision from OHR." Def. Ex. 27 at 12. Plaintiff did not apply for reconsideration of the DCOHR's decision.

The Court concludes that plaintiff's complaint was no longer "pending" with the DCOHR as of November 2006. Because plaintiff did not commmence this action until February 20, 2008, the one year statute of limitations bars plaintiff from pursuing the DCHRA claims. Accordingly, plaintiff's claims under the DCHRA are hereby **DISMISSED**.[2]

---

[2]     Because the Court concludes that plaintiff's claims under the DCHRA are barred by the statute of limitations, the Court does not reach defendant's alternate argument that these same claims are also barred under the election of remedies provision contained in D.C. Code § 2-1403.16(a).

**B.  Collateral Estoppel**

Defendant argues that because the DCOHR issued an adverse ruling on the merits of plaintiff's DCHRA claims, plaintiff is collaterally estopped from pursuing both his DCHRA claims and his Title VII claims.  The Court disagrees.  Although the Supreme Court has made it clear that a state administrative determination can preclude Title VII claims if it was affirmed by the state court, the same is not true if the agency determination was not reviewed by a state court.  Specifically, in *Kremer v. Chemical Construction Corporation*, 456 U.S. 461, 479-80 (1982), the Supreme Court held that a plaintiff was precluded from pursuing his Title VII claims because the administrative decision dismissing his New York state law claims had been affirmed by the New York state court.  *Id.* ("The [New York] Appellate Division's affirmance of the [New York State Division of Human Rights'] dismissal necessarily decided that petitioner's claim under New York law was meritless, and thus it also decided that a Title VII claim arising from the same events would be equally meritless." (citing 28 U.S.C. § 1738)).

However, in *University of Tennessee v. Elliott*, 478 U.S. 788 (1986), the Supreme Court explained that "[w]hile *Kremer* teaches that final state-court judgments are entitled to full faith and credit in Title VII actions, it indicates that

unreviewed determinations by state agencies stand on a different footing[.]" *Id.* at 792.  The Court then explicitly held, "Congress did not intend unreviewed state administrative proceedings to have preclusive effect on Title VII claims."  *Id.* at 796; *see also Bagenstose v. Dist. of Columbia*, 503 F. Supp. 2d 247, 260 (D.D.C. 2007)("[A] state administrative decision in the employment-discrimination context is entitled to preclusive effect in a subsequent Title VII suit *where that decision has been reviewed and affirmed by the state courts*."(emphasis added)), *aff'd*, No. 07-5293, 2008 U.S. App. LEXIS 2914 (D.C. Cir. Feb. 5, 2008).

In the instant case, the administrative decision by the DCOHR was not reviewed by a state court.  Accordingly, plaintiff is not precluded from litigating his Title VII claims, and the Court now turns to the merits of plaintiff's claims.

## C. Plaintiff's Discrimination Claim

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  "This statutory text establishes two elements for an employment discrimination

case: (i) the plaintiff suffered an adverse employment action (ii) because of the employee's race, color, religion, sex, or national origin." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). An adverse action in the discrimination context is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Douglas v. Preston*, 559 F.3d 549, 552 (D.C. Cir. 2009) (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)).

"[O]nce the plaintiff has made out a prima facie case, [the defendant] bears the burden of producing a non-discriminatory explanation for the challenged personnel action." *Ford v. Mabus*, 629 F.3d 198, 201 (D.C. Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973)). After defendant has produced a legitimate, non-discriminatory reason for the action, plaintiff bears the burden of showing either that "the employer's reason is pretextual or . . . that it was more likely than not that the employer was motivated by discrimination." *Id.* (quoting *Forman v. Small*, 271 F.3d 285, 292 (D.C. Cir. 2001)).

At the summary judgment stage, "once the employer asserts a legitimate, non-discriminatory reason, the question whether the

employee actually made out a prima facie case is no longer

relevant[.]" *Brady*, 520 F.3d at 493 (internal quotation marks

omitted). In other words, once an employer provides a

legitimate, non-discriminatory explanation for the challenged

action, "the district court need not - *and should not* - decide

whether the plaintiff actually made out a *prima facie* case under

*McDonnell Douglas*." *Id.* at 494. In this circumstance, the

Court must assess "whether [the plaintiff] produced evidence

sufficient for a reasonable jury to find that the employer's

stated reason was not the actual reason and that the employer

intentionally discriminated against [the plaintiff] based on his

race." *Id.* at 495. As this Circuit has repeatedly held, the

inquiry after defendant has proffered a legitimate, non-

discriminatory reason for its actions is:

> [W]hether a reasonable jury could infer intentional
> discrimination from "(1) the plaintiff's prima facie
> case; (2) any evidence the plaintiff presents to
> attack the employer's proffered explanation for its
> actions; and (3) any further evidence of
> discrimination that may be available to the plaintiff
> (such as independent evidence of discriminatory
> statements or attitudes on the part of the employer)."
> This boils down to two inquiries: could a reasonable
> jury infer that the employer's given explanation was
> pretextual, and, if so, could the jury infer that this
> pretext shielded discriminatory motives?

*Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005) (quoting

*Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir.

1998)); see also Czekalski v. Peters, 475 F.3d 360, 368 (D.C. Cir. 2007).

In the instant case, plaintiff alleges that the verbal and written reprimands, his transfer from one crew to another, and his eventual termination were discriminatory conduct by defendant in violation of Title VII. Compl. ¶ 20. In particular, plaintiff has asserted that he "received repeated, unwarranted warnings that no one else received." Pl.'s Mem. 24.

As detailed below, the Court concludes that the defendant, in its motion for summary judgment, the accompanying Statement of Material Undisputed Facts ("Def.'s Stat. Facts."), and related exhibits, has produced legitimate, non-discriminatory reasons for each of the allegedly discriminatory actions. However, with respect to one of those actions, namely the written warning issued to plaintiff in November 2005, the Court concludes that plaintiff has produced sufficient evidence from which a reasonable jury could infer intentional discrimination.

The Court will first address the November 2005 incident before addressing the remainder of plaintiff's allegations.

### 1.   The November 2005 Written Warning

It is undisputed that on or around November 2, 2005, plaintiff received a written warning. It is also undisputed that the proffered reason for the warning was insubordination,

13

more specifically that "Jeff Forsythe had to ask[] several times before [plaintiff] attended [a] training class" and that plaintiff "would not take the written test after the class was completed." Def.'s Ex. 14.

Plaintiff concedes that he did not take the written portion of the class and does not dispute that Forsythe had to ask him "several times" to attend the course. However, plaintiff claims Forsythe treated him unfairly by making him retake a course that he had already taken. Plaintiff also asserts that he therefore did not deserve the written warning.[3]

Because the defendant has provided a legitimate, non-discriminatory explanation for its actions, *i.e.* that the general contractor required all members of the crews working on its job site to take the course and that the warning was issued to plaintiff because he refused to do so, the Court must determine whether there is sufficient evidence from which a reasonable jury could infer intentional discrimination. *Murray*, 406 F.3d at 713. As noted above, the Court considers "(1) the plaintiff's prima facie case; (2) any evidence the plaintiff

---

[3] To the extent plaintiff is arguing that being required to attend the safety training course was discriminatory conduct by his employer in violation of Title VII, the Court disagrees. The Court finds that the plaintiff's required attendance at the safety training class, along with everyone else assigned to Forsythe's crew, was not an "adverse employment action."

presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (*such as independent evidence of discriminatory statements or attitudes on the part of the employer*)." *Id.* (emphasis added).

Here, evidence that Forsythe – who was plaintiff's direct supervisor at the time of the November 2005 incident – used the term "nigger" specifically in reference to plaintiff provides just such independent evidence of discriminatory statements or attitudes on the part of the employer from which a reasonable jury could infer intentional discrimination.[4] Plaintiff has therefore identified sufficient, albeit circumstantial, evidence from which a reasonable jury could infer that Forsythe's decision to issue plaintiff a written reprimand was the result of intentional discrimination. Accordingly, with respect to the November 2005 incident, the Court **DENIES** summary judgment on plaintiff's discrimination claim.

---

[4]    Whether or not Forsythe made the racist remark is itself a disputed issue of material fact.  The reprimand issued to Forsythe after plaintiff made an internal complaint, as well as defendant's submission to the DCOHR, assert that one of defendant's employees stated that he heard Forsythe use the racial slur.  Furthermore, although plaintiff has provided inconsistent statements in this regard, plaintiff stated in his deposition that he himself heard Forsythe use the racial slur. Forsythe, on the other hand, denied that he ever made a racist statement or discriminated against anyone.  Def.'s Stat. Facts ¶ 47.

## 2.    Other Allegations of Discriminatory Conduct

The Court now turns to the other allegedly discriminatory conduct by defendant, including the June 2005 warnings, the January 2006 warning and plaintiff's ultimate termination in May 2006.  First, with respect to the warnings and demotion that occurred shortly after plaintiff began working for defendant in June 2005, defendant asserts that these actions were taken because plaintiff demonstrated an inability to perform the job for which he was hired, namely safely operate heavy equipment. Defendant has submitted the written warnings themselves in support of this assertion, as well as the testimony of John Kulp and defendant's human resources director, Ricardo Tormo.

Because defendant has produced a legitimate, non-discriminatory reason for its actions, the burden shifts to plaintiff to show either "that the employer's reason is pretextual" or "that it was more likely than not that the employer was motivated by discrimination."  *Ford*, 629 F.3d at 201.  Plaintiff has not met this burden with respect to these incidents.  Quite the contrary, at his deposition, plaintiff plainly stated that he did not believe that his demotion from a heavy equipment operator and reduction in pay was because of his race, and plaintiff stated that those events "had nothing to do with my case."  Pl.'s Dep. 66:11-67:6; *see also* Pl.'s Dep. at 68

(Q: "[A]re you claiming that Mr. Kulp's decision to move you to another crew, off [Wedding's] crew onto [Forsythe's] crew, was that due to your race?" A: "No.").[5]

Similarly, with respect to the warning issued in January 2006 related to the accident on the job site that caused damage to defendant's property, the defendant has plainly offered a non-discriminatory reason for its actions. The written warning itself, which plaintiff himself signed at the time it was issued, states that plaintiff failed to report an accident in which he caused damage to property. At his deposition, plaintiff admitted that he caused an accident that resulted in damage to defendant's property. Pl.'s Dep. 115:9-115:19.

Plaintiff has also failed to point to any "evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason and that the employer

---

[5]    In December 2005, after plaintiff had made the internal complaint regarding Forsythe and after the incident related to the flagging course, plaintiff was transferred to a third crew, supervised by Foreman George Shegogue. To the extent that plaintiff alleges that his transfer from Forsythe's crew to Shegogue's crew in November 2005 supports his claim of discrimination, the Court is not persuaded that this particular transfer amounted to an adverse employment action. Unlike the transfer in June 2005 that was accompanied by a demotion and reduction in pay, plaintiff has not identified for the Court any evidence suggesting that the transfer to Shegogue's crew in December 2005 an adverse employment action.

intentionally discriminated against [the plaintiff] based on his race," *Brady*, 520 F.3d at 493, regarding the January 2006 warning. Plaintiff, quoting the Circuit's opinion in *Aka v. Washington Hospital Center*, attempts to argue that "an employer's heavy use of highly subjective criteria, such as 'interpersonal skills,' could support an inference of discrimination," 156 F.3d at 1298, and that such an inference should be drawn in the instant case because the employer's policies were unclear. Pl.'s Mem. 24. While plaintiff is correct that the heavy use of highly subjective criteria is treated with suspicion, the Court finds nothing subjective about the criteria behind this written warning, *i.e.* damage to defendant's property.

Finally, the Court considers the plaintiff's termination in May 2006. As detailed above, defendant has produced legitimate, non-discriminatory reasons for plaintiff's termination. The termination report listed several reasons for the termination, including the prior incidents for which warnings were issued, as well as the altercation at the job site in April 2006 that led to the general contractor demanding that plaintiff be permanently removed from the job site. Def.'s Stat. Facts ¶¶ 76-95. The termination report listed five violations: insubordination for failing to take a safety course, failure to

report an accident as required by company policy, "unbecoming morale and conduct," soliciting employment from another contractor, and poor performance that was "bad enough that super had to remove him before [he] could cause physical altercation amongst contractors." Def.'s Ex. 25. Defendant, in its summary judgment briefing, has particularly emphasized the altercation at the job site.

Thus, the inquiry again becomes whether, despite the reasons articulated by defendant, plaintiff has provided sufficient evidence from which a reasonable jury could infer discriminatory intent.

Plaintiff makes several arguments in this respect. First, regarding the assertion that plaintiff exhibited "unbecoming morale and conduct" and "solicited employment from another contractor," plaintiff asserts that these are charges "for which no Magnolia employee has been disciplined." Pl.'s Mem. 20. Although it is correct that evidence of pretext can include evidence of more favorable treatment of employees not in plaintiff's protected class, "[t]o prove that [plaintiff] is similarly situated to another employee, a plaintiff must 'demonstrate that all of the relevant aspects of [his] employment situation were nearly identical to those of the [allegedly comparable] employee." *Laurent v. Bureau of*

19

*Rehabilitation*, Inc., 544 F. Supp. 2d 17, 22 (D.D.C. 2008)(quoting *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999)); *see also Phillips v. Holladay Prop. Servs.*, 937 F. Supp. 32, 37 (D.D.C. 1996), *aff'd*, No. 96-7202, 1997 U.S. App. LEXIS 19033 (D.C. Cir. Jun. 19, 1997). The plaintiff's comparator must have been charged with a comparable offense and then treated less harshly than the plaintiff. *See Holbrook*, 196 F.3d at 261; *Hanna v. Herman*, 121 F. Supp. 2d 113, 120-21 (D.D.C. 2000).

In the instant case, plaintiff has failed to demonstrate that another similarly situated employee was treated more favorably. Plaintiff points first to the defendant's treatment of another employee, Norayer Mehrabian. Pl.'s Stat. Facts ¶ 12. The parties appear to agree that Mehrabian was also removed from a customer's job site, but he was not terminated for that offense. Plaintiff also alleges that two of his co-workers, Jose Parajan and Andre Bender "engag[ed] in a similar incident" by having an altercation at a job site but were sent home and "given an opportunity to 'cool off'" rather than being reprimanded or terminated. Pl.'s Stat. Facts ¶ 11.

However, plaintiff does not dispute that Mehrabian was removed from a job site for a safety violation and that the altercation between the other two employees did not involve one

of defendant's customers.  Nor does plaintiff allege that any of

these other employees accumulated multiple warnings before

termination, as plaintiff did.  Finally, plaintiff cannot show

pretext by simply asserting that *defendant* "provided no examples

of employees disciplined for [the] reasons given for Davis'

warnings and/or termination."  Pl.'s Mem. 38.  The burden is on

plaintiff to provide evidence from which a jury could infer

discriminatory intent.  The Court concludes that plaintiff has

not demonstrated a "similarly situated employee" was treated

more favorably than plaintiff.   "In the absence of evidence

that the comparators were actually similarly to [plaintiff] an

inference of falsity or discrimination is not reasonable."

*Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008).

Second, plaintiff argues that favorable statements by the

plaintiff's direct supervisor, Shegogue, are evidence that

defendant's asserted reasons for terminating plaintiff were

pretextual.  Specifically, Shegogue, in a statement apparently

obtained during defendant's investigation into the April 2006

altercation at the job site, stated that plaintiff was a "model

employee" who does "whatever I ask" and "[t]akes care of

equipment – great."  Def. Ex. 18.  The flaw in plaintiff's

argument, however, is that plaintiff himself does not dispute

that he caused an accident that caused injury to defendant's

property, that he was demoted for demonstrating an inability to perform the tasks for which he was hired, and that he was involved in an altercation with one of defendant's customers. The Court concludes that Shegogue's statement that plaintiff was otherwise a good employee does not provide "evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason" or that the employer intentionally "discriminated against [the plaintiff] based on his race." *Brady*, 520 F.3d at 493. To the contrary, the Court is not persuaded that Shegogue's statements are inconsistent with the legitimate, non-discriminatory reasons articulated by defendant.

In sum, unlike the plaintiff's claim with respect to the November 2005 incident, plaintiff has not produced sufficient evidence from which a reasonable jury could infer intentional discrimination in connection with the remainder of the challenged actions.[6] It is undisputed that Forsythe, who was

---

[6] Plaintiff also offers statistical evidence in support of his discrimination claim. In particular, he asserts that "the record demonstrates that Defendant, which employs approximately 114 employees (13 of whom are African American) and is located in the District of Columbia, a city with a majority African-American population, favors non-African American employees. Indeed, Defendant employs no African-American managers[.]" Pl.'s Mem. 24 (internal citations omitted). However, although statistical evidence may be relevant in disparate treatment actions, see *McDonnell Douglas*, 411 U.S. at 804-05, such evidence is "ordinarily not dispositive." *Krodel v. Young*, 748

plaintiff's supervisor at the time of the November 2005

incident, had no decision-making authority with respect to any

of the other incidents. [7]

Accordingly, the Court **GRANTS IN PART AND DENIES IN PART**

defendant's motion for summary judgment on plaintiff's

discrimination claim.

### D.    Plaintiff's Claim of a Hostile Work Environment

To prevail on a hostile work environment claim, "a

plaintiff must show that his employer subjected him to

'discriminatory intimidation, ridicule, and insult' that is

'sufficiently severe or pervasive to alter the conditions of the

---

F.2d 701, 710 (D.C. Cir. 1984); *see also Simpson v. Leavitt*, 437
F. Supp. 2d 95, 104 (D.D.C. 2006) (concluding that statistical
evidence of discrimination is "not conclusive [in a disparate
treatment case]" although it can bolster a claim of
discrimination "presuming other evidence exists to give rise to
an inference of discrimination").  In the instant case, the
Court further notes that the statistical evidence cited by
plaintiff is even less meaningful because it is not directly
relevant to the type of disparate treatment about which
plaintiff complains.

[7]    The Court does note, however, that the November 2005
incident was one of several reasons included by defendant in
plaintiff's termination report.  If it is determined that the
November 2005 warning was in fact the result of discrimination,
as discussed above, the question may arise whether the plaintiff
can show that discrimination "played a motivating part or was a
substantial factor in the employment decision" to terminate
plaintiff, and then whether the defendant can "demonstrate[]
that it would have taken the same action in the absence of the
impermissible motivating factor." *Fogg v. Gonzales*, 492 F.3d
447, 451 (D.C. Cir. 2007); 42 U.S.C. § 2000e-5(g)(2)(B).

victim's employment and create an abusive working environment.'"
*Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008)
(quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).
"To determine whether a hostile work environment exists, the
court looks to the totality of the circumstances, including the
frequency of the discriminatory conduct, its severity, its
offensiveness, and whether it interferes with an employee's work
performance." *Id.* (citing *Faragher v. City of Boca Raton*, 524
U.S. 775, 787-88 (1998)).

In the instant case, plaintiff alleges in his complaint
that his supervisor in July 2005 referred to him as a "nigger."
Although plaintiff's memorandum of law in opposition vaguely
asserts his supervisor used the racial slur "on more than one
occasion" in 2005, Pl.'s Mem. 14., plaintiff has not pointed to
any evidence that supports this assertion. On the contrary,
both plaintiff's complaint, as well as plaintiff's statement of
material facts as to which there exists a genuine issue to be
litigated, only refer to the one instance.[8]

_____

[8]     Paragraph 1 and paragraph 17 of plaintiff's statement of
material facts, despite the apparent typographical error
contained in the date referenced in paragraph 17, appear to
refer to the same incident. Both paragraphs rely on page six of
Plaintiff's Exhibit M; the document is defendant's submission to
DCOHR and contains, on page six, an account of the single 2005
incident.

Even assuming that plaintiff's allegations are true, the incident described by plaintiff is insufficient to support a claim of a hostile work environment. Looking at the "totality of the circumstances," the conduct described by plaintiff was not "pervasive." *Baloch*, 550 F.3d at 1201. Furthermore, "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005). Plaintiff in the instant case fails to show that his workplace was "*permeated* with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Id.* (emphasis added); *see also Lester v. Natsios*, 290 F. Supp. 2d 11, 31 (D.D.C. 2003) (holding that plaintiff failed to establish a prima facie case of hostile work environment because the events alleged were "not, individually or collectively, sufficiently 'severe' and 'pervasive' to move beyond 'the ordinary tribulations of the workplace' and 'create an abusive working environment'" (quoting *Faragher*, 524 U.S. at 787-88)). Accordingly, defendant's motion for summary judgment on plaintiff's hostile work environment claim is hereby **GRANTED**.

### E.  Plaintiff's Retaliation Claim

The anti-retaliation provision of Title VII prohibits an employer from "discriminat[ing] against any of his employees or applicants for employment . . . because [the employee] has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title."  42 U.S.C. § 2000e-3(a).  "To establish a *prima facie* case of retaliation, a claimant must show that (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action by her employer; and (3) a causal connection existed between the two."  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).

"In order to prevail upon a claim of unlawful retaliation, an employee must show she engaged in protected activity, as a consequence of which her employer took a materially adverse action against her."  *Porter v. Shah*, 606 F.3d 809, 817 (D.C. Cir. 2010) (quoting *Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009)).  An action is materially adverse in the context of a retaliation claim, if plaintiff can show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge

of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *see also Steele v. Schafer*, 535 F.3d 689, 696 (D.C. Cir. 2008); *Baloch*, 550 F.3d at 1198.

As in the context of a discrimination claim, "[r]etaliation claims based upon circumstantial evidence are governed by the three-step test of *McDonnell Douglas Corp. v. Green*, which requires the employee first to establish prima facie the elements of retaliation. If the plaintiff does so, then the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for its action." *Taylor*, 571 F.3d at 1320(internal citations omitted). If defendant rebuts plaintiff's claims in this manner, plaintiff's retaliation claims will not survive unless plaintiff is able to "produce sufficient evidence that would discredit those reasons and show that the actions were retaliatory." *Baloch*, 550 F.3d at 1200.

In the instant case, plaintiff alleges that "[s]ince complaining internally to Defendant's human resources office and since his complaint to [DCOHR], Defendant reprimanded Plaintiff on numerous occasions by issuing him unfounded or otherwise concocted warnings in retaliation for his engaging in the protected activity of complaining of unlawful discrimination and retaliation[.]" Compl. ¶ 17; *see also* Compl. ¶ 25.

In its motion for summary judgment, defendant first challenges plaintiff's *prima facie* case.  First, with respect to plaintiff's termination, defendant asserts that plaintiff has failed to establish a causal connection between plaintiff's protected activity and his termination.  In particular, defendant asserts that because plaintiff first reported the racist comment in October 2005 but was not terminated until seven months later, there is no causal connection.  Defendant also attacks plaintiff's *prima facie* case by arguing plaintiff cannot maintain a retaliation claim based on receiving written warnings.  Def.'s Reply 17.

The Court finds defendant's arguments concerning plaintiff's *prima facie* case unpersuasive.  First, this Circuit has made it clear that negative performance assessments may constitute materially adverse actions when they "affect [plaintiff's] position, grade level, salary, or promotion opportunities." *Porter v. Shah*, 606 F.3d 809, 817 (D.C. Cir. 2010); *see also Baloch*, 550 F.3d at 1191.  A "lower score on the employee's performance evaluation, by itself, is not actionable," for instance, "unless [the employee] can establish that the lower score *led to a more tangible form of adverse action*, such as ineligibility for promotional opportunities." *Brown v. Snow*, 440 F.3d 1259, 1265 (11th Cir. 2006) (relied upon

by this Circuit in *Baloch*, 550 F.3d at 1198 (emphasis added));
*see also Hyson v. Architect of the Capitol*, Civ. No. 08-979,
2011 U.S. Dist. LEXIS 88300, at *40 (D.D.C. Aug. 10, 2011) ("A
letter of counseling, written reprimand, or unsatisfactory
performance review, *if not . . . a predicate for a more tangible
form of adverse action*, will rarely constitute materially
adverse action under Title VII." (emphasis added)).

In the instant case, the Court concludes that plaintiff has
produced sufficient evidence to demonstrate that the written
warnings issued to plaintiff in November 2005 and January 2006
"led to a more tangible form of adverse action" because they
contributed to plaintiff's termination, or at least that this is
a materially disputed fact.  The termination report explicitly
relies on plaintiff's prior infractions.  Def.'s Ex. 25.

Defendant's argument relating to temporal proximity is
equally unpersuasive.  Particularly in light of the Court's
conclusion that the written warnings issued to the plaintiff are
appropriately part of plaintiff's *prima facie* case of
discrimination, the Court finds the timing of the November 2005
warning significant.  It is undisputed that Forsythe issued the
November 2005 warning to plaintiff merely two weeks after he
became aware of plaintiff's internal complaint against him.
Furthermore, after plaintiff filed a charge of discrimination

with the DCOHR in January 2006, plaintiff received an additional warning on January 30, 2006. The Court accordingly concludes that plaintiff has established a *prima facie* case of retaliation.

In the alternative, defendant argues that it has produced legitimate reasons for the conduct in question. Here, the Court is in agreement with the defendant. The defendant has, as discussed above in the context of plaintiff's discrimination claim, produced legitimate, non-discriminatory reasons for all of the challenged conduct that occurred after plaintiff filed complaints against his employer, *i.e.* the November 2005 and January 2006 written reprimands and plaintiff's termination in May 2006. Because defendant has offered legitimate, non-discriminatory reasons, plaintiff's retaliation claims will not survive unless plaintiff is able to "produce sufficient evidence that would discredit those reasons and show that the actions were retaliatory." *Baloch*, 550 F.3d at 1200. Plaintiff has failed to do so.

Plaintiff relies on substantially the same evidence used in support of his discrimination claim to argue that a reasonable jury could infer intentional retaliation. For the same reasons already articulated, the Court finds plaintiff's arguments unpersuasive. In addition, plaintiff focuses on the temporal

proximity, emphasizing the short amount of time between when
Forsythe learned of the internal complaint plaintiff made and
when Forsythe issued a written warning to plaintiff in November
2005 for insubordination.  However, "positive evidence beyond
mere proximity is required to defeat the presumption that the
proffered explanations are genuine." *Talavera v. Shah*, 638 F.3d
303, 313 (D.C. Cir. 2011) (quoting *Woodruff v. Peters*, 482 F.3d
521, 530 (D.C. Cir. 2007).  Plaintiff has failed to provide any
evidence, other than sheer temporal proximity, that would allow
a reasonable jury to infer that Forsythe's motive in issuing the
written warning was retaliatory.[9]  Accordingly, defendant's
motion for summary judgment on plaintiff's retaliation claim is
hereby **GRANTED.**

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND
DENIES IN PART** defendant's motion for summary judgment.  An
Order accompanies this Memorandum Opinion.

SIGNED:    **Emmet G. Sullivan**
           **United States District Court Judge**
           **September 30, 2011**

---

[9]    Although evidence that Forsythe used a racial slur was
sufficient circumstantial evidence from which a jury could infer
*discriminatory* intent with respect to the November 2005 warning,
the remark does not support an inference of *retaliatory* intent.
A racist remark by Forsythe, if proven, would demonstrate a
racially discriminatory animus; it would not demonstrate a
retaliatory animus.